| | |
|---|---|
| 1 | MELINDA HAAG (CABN 132612)<br>United States Attorney |
| 2 | |
| 3 | J. DOUGLAS WILSON (DCBN 412811)<br>Chief, Criminal Division |
| 4 | ADAM A. REEVES (NYBN 2363877)<br>Assistant United States Attorney |
| 5 | |
| 6 | 450 Golden Gate Avenue, Box 36055<br>San Francisco, California 94102-3495 |
| 7 | Telephone: (415) 436-436-7157<br>FAX: (415) 436-9200<br>adam.reeves@usdoj.gov |
| 8 | |
| 9 | Attorneys for Plaintiff |

FILED

2013 JUL 17 A 9: 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**MAG AG**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. **3  13  7 0788** |
| | ) | |
| Plaintiff, | ) | NOTICE OF PROCEEDINGS ON OUT-OF- |
| | ) | DISTRICT CRIMINAL CHARGES PURSUANT TO |
| v. | ) | RULES 5(c) AND (3) OF THE FEDERAL RULES |
| | ) | OF CRIMINAL PROCEDURE |
| MICHAEL BAKER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Please take notice pursuant to Rules 5(c)(2) and (3) of the Federal Rules of Criminal Procedure

that on July 17, 2013, the above-named defendant was arrested based upon an arrest warrant (copy

attached) issued upon an

    X    Indictment

    ☐    Information

    ☐    Criminal Complaint

    ☐    Other (describe) _____

pending in the Western District of Texas, Case Number A13CR 346 SS.

1

2      In that case, the defendant is charged with a violation(s) of Title 18 United States Code, Sections

3  1349, 1343, 1348, 1001 and 2.

4  Description of Charges: Securities fraud relating to ArthroCare Corporation in Austin, Texas.

5                                        Respectfully Submitted,

6                                        MELINDA HAAG
                                         UNITED STATES ATTORNEY
7

8  Date: July 17, 2013
                                         ADAM A. REVES
9                                        Assistant U.S. Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Filed  7-1/17/13

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

Clerk, U.S. District Court
Western District of Texas
By _____
Deputy

**A13CR 346 SS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. |
| Plaintiff, | |
| | **INDICTMENT** |
| v. | [Violation: 18 U.S.C. § 1349 - Conspiracy to Commit Wire and Securities Fraud; |
| MICHAEL BAKER (1), | 18 U.S.C. §§ 1343 and 2 - Wire Fraud; |
| MICHAEL GLUK (2), | 18 U.S.C. §§ 1348 and 2 - Securities Fraud; and 18 U.S.C. § 1001 - False Statements] |
| Defendants. | |

THE GRAND JURY CHARGES:

## General Allegations

At all relevant times to this Indictment:

### Relevant Individuals and Entities

1.      ArthroCare Corporation ("ArthroCare") was a Delaware corporation

headquartered in Austin, Texas.

2.      Among other products, ArthroCare sold medical devices that used its patented

technology, called Coblation, to physicians and surgery centers. Coblation technology was

designed to be used by physicians in surgical procedures to remove soft tissue in a way that was

minimally invasive.

3.      ArthroCare sold medical devices directly to physicians, surgery centers, and other

end-users through its sales representatives and sales agents. In addition, ArthroCare sold

1

medical devices to distributors, who would then resell ArthroCare's products to physicians, surgery centers, and other end-users.

4. ArthroCare's stock was traded publicly on NASDAQ, a national securities exchange, and its stock was registered with the United States Securities and Exchange Commission ("SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934.

5. DiscoCare, Inc. ("DiscoCare") was a privately owned Delaware corporation, which was incorporated in 2005. DiscoCare was located at 2047 Palm Beach Lakes, Suite 200, West Palm Beach, Florida. ArthroCare was DiscoCare's only supplier. At various times, DiscoCare was ArthroCare's largest single distributor of medical devices. On December 31, 2007, ArthroCare acquired DiscoCare.

6. Distributor 1 was a privately owned Oklahoma corporation, which was incorporated in 1988. Distributor 1 acted as a sales agent and then as a distributor of ArthroCare's medical devices.

7. Distributor 2 was a privately owned California corporation, which was incorporated in 1982. Distributor 2 acted as a distributor of ArthroCare's medical devices.

8. Distributor 3 was a privately owned Pennsylvania corporation, which was incorporated in 1981. Distributor 3 acted as a sales agent and then as a distributor of ArthroCare's medical devices.

9. Distributor 4 was a privately owned Australian limited liability company. Distributor 4 acted as a distributor of ArthroCare medical devices until August 2006, when ArthroCare acquired Distributor 4.

2

#### The Defendants

10.     From 1997 until February 2009, **MICHAEL BAKER** was employed by
ArthroCare. For the entire time period of his employment, **BAKER** was the Chief Executive
Officer of ArthroCare. **BAKER** also served as a Director on ArthroCare's Board of Directors.
All employees of ArthroCare ultimately reported to **BAKER**.

11.     From 2004 until December 2008, **MICHAEL GLUK** was employed by
ArthroCare. From 2004 until approximately May 2006, **GLUK** was Vice President of Finance
and Administration. From approximately May 2006 until December 2008, **GLUK** was the Chief
Financial Officer of ArthroCare. As Chief Financial Officer, all finance and accounting staff at
ArthroCare reported to **GLUK**.

12.     As ArthroCare employees, **BAKER** and **GLUK** received bonuses, restricted
stock, and stock options that were tied to ArthroCare's financial performance.

#### The Co-Conspirators

13.     From 1997 until December 2008, John Raffle was employed by ArthroCare.
From approximately June 2001 until approximately May 2006, Raffle was Vice President of
Corporate Development and Legal Affairs. From approximately May 2006 until December
2008, Raffle was the Senior Vice President of Strategic Business Units. As Senior Vice
President of Strategic Business Units, all marketing and sales staff at ArthroCare reported to
Raffle.

14.     From 2001 until December 2008, David Applegate was employed by ArthroCare.
In approximately February 2004, Applegate became the Vice President in charge of
ArthroCare's Spine division. As the Vice President in charge of the Spine division, all

3

marketing staff in the Spine division reported to Applegate. In 2006, all sales staff in the Spine division also began reporting to Applegate. In April 2008, Applegate was promoted to Senior Vice President.

## The Federal Securities Laws and SEC Rules and Regulations

15.     The SEC was an independent agency of the United States government that was charged by law with preserving honest and efficient markets in securities. The federal securities laws, regulations, and rules were designed to ensure that the financial information of publicly traded companies was accurately recorded and disclosed to the investing public. As a publicly traded company, ArthroCare and its directors, officers, and employees were required to comply with the federal securities laws, regulations, and rules. Under the federal securities laws and regulations, ArthroCare was required, among other things, to file with the SEC annual reports (known as SEC Forms 10-K), quarterly reports (known as SEC Forms 10-Q), and other periodic reports that included accurate and reliable financial statements.

16.     From June 2006 through March 2008, for each annual and quarterly report ArthroCare filed with the SEC, **BAKER** and **GLUK** signed certifications attesting that, among other things, based on their knowledge (a) the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and (b) that the reports fairly presented in all material respects the financial condition of ArthroCare.

4

## The Scheme to Defraud

### A.   Overview of the Scheme

17.    From at least December 2005 through in or about December 2008, **BAKER,**
**GLUK,** Raffle, Applegate, and others, known and unknown, devised, intended to devise, and
executed a scheme to defraud ArthroCare's shareholders and members of the investing public
by: (a) inflating falsely ArthroCare's revenue by tens of millions of dollars; (b) concealing the
nature and financial significance of ArthroCare's relationship with DiscoCare and other
distributors; and (c) using a series of sham transactions to manipulate ArthroCare's revenue and
earnings as reported to investors.

### B.   Purpose of the Scheme

18.    The purpose of the scheme was to:  (a) conceal from ArthroCare's shareholders,
the investing public, and ArthroCare's external auditors the true nature of the purported sales to
ArthroCare's distributors; (b) make materially false and fraudulent representations to
ArthroCare's shareholders and the investing public about ArthroCare's financial condition in
order to maintain and increase the market price of ArthroCare's stock; and (c) enrich **BAKER,**
**GLUK,** Raffle, and others through the continued receipt of compensation and the appreciation of
their own ArthroCare stock and stock options.

19.    **BAKER, GLUK,** Raffle, Applegate, and others inflated falsely ArthroCare's
sales and revenue through a series of end-of-quarter transactions involving ArthroCare's
distributors, including DiscoCare and Distributors 1 through 4. After **BAKER, GLUK,** Raffle,
Applegate, and others determined the type and amount of product to be shipped to distributors
based on ArthroCare's need to meet sales forecasts, rather than the distributors' need for the

5

products, **BAKER, GLUK,** Raffle, Applegate, and others caused ArthroCare to ship millions of dollars worth of ArthroCare's medical devices to its distributors at the end of quarters. ArthroCare would then report these shipments as sales in its quarterly and annual filings at the time of the shipment, enabling the company to meet or exceed internal and external earnings forecasts.

20.     However, as **BAKER, GLUK,** Raffle, and Applegate knew, ArthroCare's distributors agreed to accept shipment of millions of dollars of excess inventory because ArthroCare had agreed to: (a) provide the distributors extended payment terms; (b) pay the distributors substantial, upfront cash commissions; (c) allow the distributors to return the product; and (d) in some cases, acquire the distributor and the excess inventory so that the distributor would not have to ultimately pay ArthroCare for the products at all.

21.     **BAKER, GLUK,** Raffle, and Applegate caused ArthroCare to inflate falsely its revenue by tens of millions of dollars, as ArthroCare was prohibited from counting such shipments as sales under the accounting rules governing revenue recognition and also under ArthroCare's internal revenue recognition policy. In addition, ArthroCare failed to disclose the conditions related to the shipment of the product in its quarterly and annual filings, and instead claimed in its filings that that it was following the revenue recognition rules. In essence, **BAKER, GLUK,** Raffle, and Applegate caused ArthroCare to park tens of millions of dollars of its inventory with its distributors, while causing ArthroCare to inform investors that it had actually sold the product.

22.     **BAKER, GLUK,** Raffle, and others also concealed the nature and extent of ArthroCare's relationship with DiscoCare and other distributors. With respect to DiscoCare, **BAKER, GLUK,** Raffle, Applegate, and others arranged to have ArthroCare purchase

6

DiscoCare on December 31, 2007 to conceal from investors the nature and financial significance of ArthroCare's relationship with DiscoCare, including that: (a) DiscoCare was, by far, ArthroCare's largest single source of revenue from December 2005 through December 2007, and that ArthroCare reported over $37 million in revenue in its publicly filed financial statements based on purported sales to DiscoCare; (b) DiscoCare accounted for almost all of the growth in ArthroCare's Spine division during that time period; (c) DiscoCare accounted for almost all of the growth in ArthroCare's Sports division in the Third and Fourth Quarters of 2007; (d) DiscoCare's receivable to ArthroCare (the amount that DiscoCare owed to ArthroCare) was, by far, the largest of any ArthroCare customer, and that by December 2007, DiscoCare owed ArthroCare over $26 million; (e) ArthroCare billed DiscoCare nearly four times as much for medical devices as compared to what ArthroCare billed its other customers; and (g) the vast majority of DiscoCare's business was contingent on obtaining payment for the medical devices it purchased from ArthroCare through the settlement of personal injury cases.

23. **BAKER, GLUK**, Raffle, Applegate, and others also manipulated ArthroCare's revenue and earnings reported to investors through a series of sham transactions. When **BAKER, GLUK**, Raffle, Applegate, and others learned, after the end of a reporting period, that ArthroCare's revenues or earnings were less than a desired amount, they caused ArthroCare to manipulate revenue or earnings through sham transactions designed to increase revenue or earnings. When **BAKER, GLUK**, Raffle, Applegate, and others learned, after the end of a reporting period, that ArthroCare's revenues exceeded a desired amount, they caused ArthroCare to enter into sham transactions that lowered revenue.

7

## C. False Inflation of ArthroCare's Earnings

24.  Shareholders of ArthroCare stock, stock market analysts, and members of the investing public tracked ArthroCare's earnings per share or "EPS." EPS was considered a key determinant of a company's share price because it reflected a company's profitability. ArthroCare reported its EPS each quarter in Forms 10-Q, and each year in Forms 10-K, which were filed with the SEC.

25.  Between in or about 2005 through in or about July 2008, **BAKER** and **GLUK** communicated to the shareholders of ArthroCare stock, stock market analysts, and members of the investing public that ArthroCare would grow revenue and EPS by at least twenty percent each year.

26.  Based in part on these communications from **BAKER** and **GLUK**, and prior to ArthroCare's financial reporting for each quarter and for each year, stock market analysts issued forecasts for the company's EPS. The average of the analysts' predictions about ArthroCare's EPS was referred to as the "consensus EPS."

27.  **BAKER, GLUK,** Raffle, and other senior executives at ArthroCare closely tracked the consensus EPS for each quarter and each year.

28.  For each financial reporting period from December 2005 through December 2007, ArthroCare purportedly met or exceeded the stock market analysts' consensus EPS.

29.  As described in Paragraphs 17 through 23 above, **BAKER, GLUK,** Raffle, Applegate, and others directed the end-of-quarter shipments to ArthroCare's distributors and engaged in other sham transactions in order to overcome quarterly revenue shortfalls and to meet the consensus EPS. **BAKER, GLUK,** Raffle, Applegate, and others concealed the true nature of

8

the purported sales on the end-of-quarter shipments from ArthroCare's external auditors so that ArthroCare could recognize as revenue the purported sales in ArthroCare's publicly filed financial statements and so that ArthroCare would meet the consensus EPS.

### D.    The Victims

30.    Between December 2005 and December 2008, ArthroCare's shareholders held more than 25 million shares of ArthroCare stock.

31.    On July 21, 2008, ArthroCare announced publicly that it would be restating its previously reported financial results from the Third Quarter 2006 through the First Quarter 2008. That day, the price of ArthroCare shares dropped from approximately $40.03 to approximately $23.21 per share. On December 19, 2008, ArthroCare announced publicly that it had identified accounting errors and possible irregularities in its revenue recognition practices going back to 2005. That day, the price of ArthroCare shares dropped from approximately $16.23 to approximately $5.92 per share.

## THE CHARGES

### COUNT ONE
### Conspiracy to Commit Wire and Securities Fraud
### (18 U.S.C. § 1349)

32.    Paragraphs 1 through 31 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

33.    From at least December 2005, the exact date being unknown to the Grand Jury, through December 2008, in the Western District of Texas and elsewhere, the defendants,

### MICHAEL BAKER
### and
### MICHAEL GLUK

9

did knowingly and willfully conspire and agree with John Raffle, David Applegate, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, namely:

(a) wire fraud, that is, to knowingly and with intent to defraud, devise, and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmitting and causing certain wire communications to be transmitted in interstate and foreign commerce, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

(b) securities fraud, that is, to knowingly and intentionally execute a scheme and artifice (i) to defraud any person in connection with any security of ArthroCare, an issuer with a class of securities registered under § 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, § 781), and (ii) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, any money and property in connection with the purchase and sale of any security of ArthroCare, an issuer with a class of securities registered under § 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, § 781), in violation of Title 18, United States Code, Section 1348.

## PURPOSE OF THE CONSPIRACY

34.   The Grand Jury realleges and incorporates by reference Paragraph 18 of this Indictment as a description of the purpose of the conspiracy.

10

## MANNER AND MEANS

35.    The Grand Jury realleges and incorporates by reference Paragraphs 18 through 29

of this Indictment as a description of the manner and means of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH TWELVE
### Wire Fraud
### (18 U.S.C. §§ 1343 and 2)

36.    Paragraphs 1 through 31 of this Indictment are realleged and incorporated by

reference as though fully set forth herein.

37.    From at least December 2005, the exact date being unknown to the Grand Jury,

through December 2008, in the Western District of Texas and elsewhere, the defendants,

### MICHAEL BAKER
### and
### MICHAEL GLUK

aided and abetted by others known and unknown to the Grand Jury, did knowingly and with

intent to defraud devise a scheme and artifice to defraud, and to obtain money and property by

means of materially false and fraudulent pretenses, representations and promises, knowing that

the pretenses, representations, and promises were false and fraudulent when made.

## PURPOSE OF THE SCHEME AND ARTIFICE

38.    The Grand Jury realleges and incorporates by reference Paragraph 18 of this

Indictment as a description of the purpose of the scheme and artifice.

## THE SCHEME AND ARTIFICE

39.    The Grand Jury realleges and incorporates by reference Paragraphs 18 through 29

of this Indictment as a description of the scheme and artifice.

11

## USE OF THE WIRES

40.    On or about the dates specified as to each count below, the defendants, in the Western District of Texas and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as more particularly described below:

| Count | Defendant(s) | Approximate Date | Description of Wire Communication |
|---|---|---|---|
| 2 | BAKER GLUK | January 18, 2008 | ArthroCare Conference Call with BAKER and GLUK in Texas and investors and analysts in various States |
| 3 | BAKER GLUK | January 24, 2008 | Email from GLUK in Texas to a third-party routed through ArthroCare's servers in California |
| 4 | BAKER GLUK | January 24, 2008 | Email from GLUK in Texas to a third-party routed through ArthroCare's servers in California |
| 5 | BAKER GLUK | January 25, 2008 | Email from BAKER in Texas to a third-party routed through ArthroCare's servers in California |
| 6 | BAKER GLUK | February 19, 2008 | ArthroCare Conference Call with BAKER and GLUK in Texas and investors and analysts in various States |
| 7 | BAKER GLUK | March 20, 2008 | Email from GLUK to BAKER in Texas routed through ArthroCare's servers in California |
| 8 | BAKER GLUK | April 17, 2008 | Email from BAKER to an ArthroCare employee in Texas routed through ArthroCare's servers in California |
| 9 | BAKER GLUK | April 21, 2008 | ArthroCare Conference Call with BAKER and GLUK in Texas and investors and analysts in various States |
| 10 | BAKER GLUK | May 9, 2008 | Email from BAKER to Raffle in Texas routed through ArthroCare's servers in California |
| 11 | BAKER GLUK | May 14, 2008 | Email from BAKER to Raffle in Texas routed through ArthroCare's servers in California |
| 12 | BAKER GLUK | June 9, 2008 | Email from BAKER to GLUK, Raffle and Applegate in Texas and routed through ArthroCare's servers in California |

In violation of Title 18, United States Code, Sections 1343 and 2.

12

## COUNTS THIRTEEN THROUGH FOURTEEN
### Securities Fraud
### (18 U.S.C. §§ 1348 and 2)

41.  Paragraphs 1 through 31 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

42.  On or about the dates set forth below, each such date constituting a separate count of this Indictment, within the Western District of Texas and elsewhere, the defendants

### MICHAEL BAKER
### and
### MICHAEL GLUK

did knowingly and intentionally execute a scheme and artifice (a) to defraud any person in connection with any security of ArthroCare, an issuer with a class of securities registered under § 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, § 78l), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, any money and property in connection with the purchase and sale of any security of ArthroCare, an issuer with a class of securities registered under § 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, § 78l), to wit, **BAKER, GLUK**, and others made, and caused to be made, false and misleading representations to ArthroCare's shareholders and members of the investing public about ArthroCare's quarterly and annual sales, revenues, expenses and earnings, and about the nature and financial significance of ArthroCare's relationship with its distributors.

| Count | Approximate Date | Description of Event |
|-------|------------------|----------------------|
| 13 | February 29, 2008 | SEC Form 10-K for 2007 |
| 14 | May 12, 2008 | SEC Form 10-Q for First Quarter 2008 |

In violation of Title 18, United States Code, Sections 1348 and 2.

13

## COUNTS FIFTEEN THROUGH SEVENTEEN
### False Statements
### (18 U.S.C. § 1001)

43. Paragraphs 1 through 31 of this Indictment are realleged and incorporated by

reference as though fully set forth herein.

44. On or about the dates specified as to each count below, in the Western District of

Texas and elsewhere, the defendant **MICHAEL BAKER** made statements to representatives of

the United States Securities and Exchange Commission that were materially false, as more

particularly described below:

| Count | Approximate Date | False Statement(s) |
|-------|------------------|--------------------|
| 15 | November 18, 2009 | In his sworn deposition before the SEC, **BAKER** falsely stated that he did not participate in any discussions with Raffle related to a return merchandise authorization transaction in the Second Quarter of 2006 that was designed to move revenue from one quarter to the next, did not authorize that transaction, and was not aware at the time of whether that transaction took place. |
| 16 | November 18, 2009 | In his sworn deposition before the SEC, **BAKER** falsely stated that the DiscoCare acquisition was not done to avoid having to disclose the size of DiscoCare's receivable, and that he was never part of a discussion regarding the acquisition being used to avoid disclosing the size of the DiscoCare receivable. |
| 17 | November 18, 2009 | In his sworn deposition before the SEC, **BAKER** falsely stated that the $25 million purchase price for DiscoCare was not related to the $25 million termination fee in ArthroCare's existing contract with DiscoCare, and that there was never any discussion of basing the $25 million purchase price on the termination fee. |

In violation of Title 18, United States Code, Section 1001.

### FORFEITURE ALLEGATION

45. As the result of committing wire, and securities fraud offenses, in violation of

Title 18, United States Code, Sections 1343, 1348, 1349 and 2, and, as alleged in Counts One

14

through Fourteen of this Indictment, **MICHAEL BAKER** and **MICHAEL GLUK**, the

defendants, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.

§ 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to

the commission of the offenses alleged in Counts One through Fourteen of this Indictment.

## **Substitute Asset Provision**

46.     If any of the above described forfeitable property, as a result of any act or

omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value;

(e) or has been commingled with other property which cannot be subdivided without

    difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other

property of said defendant up to the value of the above forfeitable property.

Title 18, United States Code, Sections 981 and 1343; Title 28, United States Code,

Section 2461.

15

A TRUE BILL:

**ORIGINAL SIGNATURE
REDACTED PURSUANT TO
E-GOVERNMENT ACT OF 2002**

JEFFREY H. KNOX
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

By: _____

Benjamin D. Singer
Deputy Chief
Fraud Section, Criminal Division
U.S. Department of Justice

By: _____

Henry P. Van Dyck
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice

16